Agenda number 15 case number 106 982 in radio state of Max Feinberg deceased Layla Taylor at all versus Michael Feinberg Good morning, may it please the court. My name is Stan Sneeringer. I'm here today with Michael Durkin sitting with me at council table. We represent Michael Feinberg, one of the two co-executives of the Estates of Max and Layla Feinberg. This appeal presents the question of whether a clause that provides a disincentive to a particular range of potential marriages should be given in effect in accordance with Illinois' long-standing principle of enforcing a testator's plainly stated intent. Michael brings this appeal in accordance with his duties as an executor in order to give full effect to his father's expressly stated intentions and his clear and long-standing wish to foster and encourage his faith within his family, in his grandchildren, and hopefully in their children as well. During his life, Max Feinberg expressed a deep concern with the decline of Judaism in America due to interfaith marriage. He sought to prevent this decline within his own family by providing an incentive to his grandchildren to remain and marry within the faith. In this way, he sought to keep not only his grandchildren within the faith, but to encourage them to raise their own children in the tradition of his forefathers. The mechanism Max employed was a testamentary provision that I call the Religious Preference Clause. The clause stated that any of Max's descendants other than his children who married, quote, outside the Jewish faith would be, quote, deemed deceased for the purposes of Max's testamentary trust. Now, a few side notes. I call it the Religious Preference Clause rather than what the lower courts and the parties in the lower courts called it, the Jewish clause, because the use of such clauses is not in any way unique to Judaism. Clauses of this type have been used by a number of religiously motivated testators of various faiths. The most common faiths involved do appear to be Judaism and Roman Catholicism, but I have seen one employed in case law by a Greek Orthodox testator, and there's no reason to believe that they are not in use by any number of testators of other faiths today. Second, the provisions used of the term deemed deceased should not be interpreted as an indication that Max himself somehow considered a grandchild who had married outside the faith to be literally or figuratively dead to him. The term is a common estate planning technique used to easily and neatly define a class. Simply put, an estate planning document might state that a contingent beneficiary should be deemed deceased for purposes of that document upon failure of any given condition. Counsel? Section 29 of the Restatement, Third of Trusts, provides that trust provisions which are contrary to public policy, and you know we're eventually going to start talking about whether these type of provisions are void against public policy, but specifically with respect to the restatement, Comment 1 to that section gives a specific example as a provision that terminates all of a beneficiary's rights to a trust if he marries a person who is not of a specified religion. Is that exactly what happened here? Well, the example given in the restatement is not what happened here. The example in the restatement uses a funded trust to coerce future behavior or to influence future behavior. It says, you'll have this trust, but if you ever marry outside the faith, you lose the trust. I don't concede, and Michael doesn't concede, that the principle laid out in the restatement should apply here. If it did apply here, however, it wouldn't apply to the facts of this case, because in this case, although Max's trust created what we call a condition subsequent, that is, it created trust that the descendants could lose if they married outside the faith, Max's trust also gave his widow, Erla, a power of appointment that she could exercise during her lifetime. Erla did, in fact, exercise that power of appointment. What she did was she made bequests to all of the children and grandchildren who were not, quote, deemed deceased, and made those bequests effective upon her death, and those bequests were of an amount sufficient to drain the trust completely. There was nothing left after those bequests. What Erla did there was transform the condition subsequent in Max's trust to a condition precedent. It's no longer a trust that could be lost in the event of some future action. It's now a status as of the date of Erla's death. Any descendant who was deemed deceased as of the date of Erla's death was ineligible. That condition precedent is completely different from what's set forth in the restatement. Can we talk about the specifics of this case? Sure. There were five children, is that five grandchildren? There are five grandchildren. At the time of Max's death, four of them were married? All of them were married. At the time of Max's death, none of them were married. At the time of Erla's death, all of them were married. All right. But only one of the five was married to a Jewish spouse? That's correct. So the four other children were ultimately, well, they had another option. The option would have been if they could convert within a year. That's right. Any of the spouses could have converted. And none of the spouses converted within a year? That's correct. None of the... So all of those four grandchildren were all treated as deceased in the distribution of trustees, is that correct? For the purposes of Max's trust, that's correct. Is there an inference from that that marriage played some part in the reason that they were considered deceased? Well, they were considered deceased because that's the plain language of the trust. To say that marriage played a part, I suppose that's correct. Well, if they had, they could have chosen the option of divorcing too as well, couldn't they? I know it doesn't seem to be mentioned, but they could have done that. They would have qualified for the trust, wouldn't they? There's nothing in the trust that would say that one who remarries or divorces would somehow become eligible again. But that person wouldn't be deceased by the words of the trust or the words of the estate, the will. I believe they would because they had married outside the faith. And the term of the trust says anyone who marries outside the Jewish family. I guess that brings us to Justice Thomas' public policy consideration. And is it your position that that public policy analysis favors your position in this case? I don't believe that there is a public policy in favor of striking all testamentary provisions that tend to discourage or provide a disincentive for a particular range of marriages. I don't think that that public policy exists. In the restatement, the restatement provision, again, leaving aside the question of whether the restatement only applies to conditions precedent rather than subsequent, the restatement provision acknowledges in the reporter's notes that it is a reversal of the common law. And let me step back and say that in order to void a testamentary provision, the lower courts needed to find that there was a clear violation of a settled public policy, where public policy is found in the Illinois and federal constitutions, in the statutes of the state of Illinois, and in the common law decisions of the courts of Illinois. Finding that public policy in a restatement provision that the authors acknowledge is unsupported by the existing common law isn't a settled public policy that would justify overriding a testator's plainly stated intent. Here, when Max entered into this provision, there was no question that the prevailing common law rule was that these provisions were enforceable. It's in every treatise. It's in the restatement second. It's the highest courts of four of Illinois' sister states had explicitly considered these provisions and found them enforceable. It's Oregon, Pennsylvania, Maryland, and Massachusetts. The highest court of New York had considered it in dicta and said it was enforceable. And in fact, there are any number of New York cases enforcing these provisions. Counsel, do you take exception with, as a general rule, the testamentary provisions that act as a restraint upon marriage or which encourage divorce or void against public policy? Or are you saying you don't fit into that general rule because of your status argument? I do take exception to that general rule for two reasons. First, the term restraint on marriage is not particularly apt. There's no actual restraint on marriage here. There's a restraint on inheritance. No testator can actually prevent one of their beneficiaries from marrying or not marrying anyone of their choice. But the other reason I take exception is because there doesn't seem to be any kind of general rule against so-called partial restraints on marriage. The common law decisions, both in Illinois and outside of Illinois, recognize that there are a variety of quote-unquote partial restraints that are enforceable. A provision that provided a disincentive to marriage to a particular individual. A provision that provided a disincentive to marriage before or after or within a certain age range. A provision that required consent to a particular marriage. All of those have been enforced at the common law. And decisions of the intermediary appellate courts in Illinois have indicated that those types of provisions are enforceable as well. So I think it would be a mistake to say that there is a general rule that forbids enforcement of clauses that tend to discourage a lawful marriage. In the Winterland case though, right, of this court, there was an indication, there was a provision rather, that one of the sons would not get the inheritance unless he either divorced his wife or his wife died. Well, and that's... I suspect the same thing could be said about that. That it, you know, it wasn't a restraint on marriage or promoting divorce. It was a clause that involved monies going to that child. But nonetheless, the Supreme Court held that clause in. I think Michael would concede that a clause that tended to encourage a divorce would not be enforced or should not be enforced. And that's the real distinguishing principle between Winterland, Tripp v. Payne, In re Estate of Gerbing, and Ransom v. Boston. All of these cases were relied upon by the lower courts and by the appellees. But all of them considered a provision that, through a condition subsequent, again, would have encouraged divorce. And we concede that those cases state a valid public policy and an enforceable public policy. Counsel, has any court in Illinois ever adopted the Restatement Third of Trust? I am unaware of any court adopting it in total. There have been two published decisions that adopt particular provisions of the Restatement Third. Neither of those cases adopt a provision that states a particularly controversial statement of law. Certainly, neither of the adopted provisions constitute a 180-degree reversal of the common law the way this particular restatement provision does. I forget exactly what they are, but one was primarily a procedural matter and one was a matter of some minor substance, but that had been clearly established by the common law. And the reporter's notes in those provisions are full of prevailing common law authority to support those propositions. This is in opposition to the Restatement provision here. Here, the Restatement provision directly contradicts the current second restatement of property on donative transfers. That restatement specifically states that these clauses are enforceable. And in the Restatement Third of Trust, in the reporter's notes, the reporters acknowledge that the new, quote-unquote, new rule in the third restatement contradicts the provision of the restatement second on property and says, it is probably true, this is a close paraphrase, it is probably true that the rule stated in the Restatement Second of Property Donative Transfers is generally supported by the American cases in point. If the reporters themselves are acknowledging that the direct opposite rule is generally supported by the American cases in point, how else are we to view that restatement provision as anything other than a prescriptive and normative personal view of how they believe the law ought to be? And in that sense, it really fails the mission of a restatement. The American Law Institute publishes restatements of the law and it publishes model codes. And it distinguishes between these by saying that the model code is a statement of what they believe the law should be. And it's put out there so that courts and legislatures can consider whether the law should move in a certain direction. The restatement, according to the American Law Institute, is intended to be a statement of the law as it is. It's supposed to be black letter law. But that's not what happened in this particular restatement provision. By the author's own acknowledgement, it simply isn't black letter law. And again, I won't go through the list again, but any number of common law decisions have enforced these clauses. In fact, you have to go back to 1854, Maddox versus Maddox's administrator in Virginia, to find a case that ever struck down a religious preference clause. And it only did so in that case. Because the clause was so restrictive that it amounted to a general restraint on marriage. And again, Michael concedes that a general restraint on marriage would not be enforced. And should not be enforced. Mr. Spearing, I'd like for you to help me understand one of your earlier comments about a condition subsequent and a condition preceding. If we start from the proposition that any testate or max here could have decided to disinherit any of his grandchildren who had already been married and had married outside the Jewish faith. I take it no one would argue that there's anything wrong with it. In fact, he wouldn't have to put anything into the will that says that. If I understand you correctly, you're saying by creating the trust and giving Erla the power of appointment over the trust, when she exercised it, that was the situation. The grandchildren were married, she knew, and that was therefore a condition preceding? Well, I'm not making a claim about Erla's knowledge. But I am saying that, yes, it was a condition preceding. Erla could have absolutely excluded any of the grandchildren or none of them or some of them by name for any reason or no reason. There's no right to inherit. And what she can do... She wasn't bound by the condition of Max's trust? Well, I don't believe she was, primarily because Max's trust states that the provision is for the purposes of that instrument, Max's trust, not the power of appointment. However, it really doesn't matter if she was or wasn't. What she intended was to exclude beneficiaries as if that clause were enforceable. When she exercised the power of appointment, she had every reason to believe that that clause was going to be enforced. And what she could do by name, by specifically excluding Michelle by name, she could do by naming a class. That's another fundamental principle here. What she did, and that's what she did, she named a class that Michelle was a part of, that class of beneficiaries who were not deemed deceased. And so... Excuse me. And so it really doesn't matter whether it was or wasn't enforceable. She intended to exclude Michelle because we have no reason to believe that she could have thought anything other than it was going to be enforced. Every authority at the time she exercised this power of appointment said it was going to be enforced. So, no, I would disagree that she's limited in any way by the terms of Max's trust. And what she did by condition precedent is 100% enforceable under both the restatement provision cited by the lower courts and by the Apolee and by the dicta in Ransdell that are cited by the lower courts and the Apolee. Both of those authorities... The restatement explicitly says it, that the scope of that restatement provision is limited to clauses that would influence future conduct. And once Erla had exercised her power of appointment, and on the date of her death, it was a status effect. There's no effect on future conduct there. And Ransdell talked about clauses that were calculated to prevent or to encourage... prevent a lawful marriage or encourage a divorce. And so that language is clearly directed to the future as well. So, again, nothing in either of those two sources of the supposed public policy identified by the lower courts would actually act to prevent enforcement of Erla's power of appointment in this case. I see my time is nearly up. Unless the court has any further questions, I think I'll just proceed the rest of my time.  You may proceed, counsel. Thank you. May it please the Court, Honorable Justices. I'd like to first start by commenting on this issue of Erla's power of appointment, because really, in many ways, that is not before this Court. The trial court did not make any findings as to Erla's intent. Erla was arguably... Yes, Your Honor. I'm not sure. I don't think you stated your name. Oh, sorry. Chris Langone. Thank you, sir. For the aptly Michelle Feinberg troll. The trial court did not make any findings about Erla's intent. And that is one of the issues in this case, is that the executors are alleged to have taken millions of dollars out of Erla's estate when she was alive and in a nursing home and basically lacking in capacity. Erla attended the wedding, which, by the way, was officiated by a rabbi and was a religious wedding. So if you want to look at the plain language of the clause quite literally, the marriage occurred within the Jewish faith. It was a Jewish wedding. Erla was present. The reason that they're trying this argument now is because they do recognize the concern of this dead hand control that goes on and on and on. Max died in 1983. Erla died in 2003. At any time between 1983 and 2003, if Michelle married somebody outside of the Jewish faith, she would be deemed deceased. So Max's condition subsequent affects Michelle's marriage conduct in 83 and 84 and 85 and all the way up in that 20 year period when Erla finally dies. Did she know that or does it make any difference? We contend that it does not make any difference, but as a matter of fact, no, she did not know that. She was told by her father that so long as you are married in a Jewish wedding, you are okay. And that brings up another question. You're talking about facts. Is this strictly a question of law or are you talking about there's some factual component here? No, it is strictly a question of law, DeNovo, as to the fact that the clause is void as against public policy. So you're not saying that she fits within the clause and she ought to be a part of this recovery? Well, I mean, if this court were to reverse and get through all of the hurdles that they have to get through regarding the vagueness of the clause and whether it violates public policy and whether it's impermissible dead hand control, then at the end of the day, there would need to be a factual determination in that regard because what do the words marries within the Jewish faith mean? Well, we contend the plain language literally means married within the Jewish faith at a Jewish wedding. We're not going to construe that language. And I don't think the court should because I'm just pointing out that this point about what Erla knew and all of these fact questions are not before the court. Erla's power of appointment was limited. Erla couldn't just appoint to anybody. Erla could only appoint to descendants of Max. And Max defined descendants, his descendants, to exclude anybody that married outside the Jewish faith. Counsel, is it true the majority of jurisdictions that have addressed this exact question have found the trust provision enforceable? I don't believe that that is true because, first of all, you have to look at jurisdictions that have decided the issue by common law and those that have decided by statute. Five states have passed. The states that I have down are Massachusetts, New York, New Jersey, Oregon, and Maryland. Correct. We don't have to follow those, but. Absolutely. Not only do we not have to follow those, but this court in Tripp v. Payne stated that if the Constitution and statutes of this state have declared our public policy on this question or if the question has been passed upon by our courts, we must look to such enactments and decisions and not to those of other jurisdictions. And this court in Ransdell stated, it is of the first importance to society that contract and testamentary gifts which are calculated to prevent lawful marriage or bring about divorcement should not be upheld. Then the court goes on to say, yes, it is also important that the testator's intent be acknowledged and enforced but then specifically says with such limitations as conditions as they believe are for the best interest of the donee. In other words, if I were. Is it critical to your prevailing in this case that this court adopt the restatement of trust third, section 29? No. This court, I believe, already has. I believe the restatement is based on decisions from this court like Ransdell that say the public policy is to encourage marriage. This court. So you disagree with your opponent that restatement third is an advocacy of legal reform, not a compilation of existing law? No, I believe that the restatement is a compilation of existing law. I believe that the restatement correctly restated existing law. The difference between the restatement third and the restatement second is about 50 years. The restatement second came out in the 50s. This was before we had the Civil Rights Act of 1967. This is before we had hate crime laws. This is before we had statutory enactments that say that the public policy is not to discriminate. Maybe it was okay in the 1800s to say that if my daughter marries a black person or she marries a Catholic or she marries outside of the Jewish faith, she's dead to me and she's disinherited. Maybe that was okay when the Massachusetts Supreme Court in Gordon v. Gordon is following an opinion, Jarman on Wills, and I'm quoting now from Jarman on Wills. Conditions not to marry a papist or a Scotchman or not to marry anybody but a Jew have been held to be good. Jarman on Wills, 1497. When you look at the common law, and the common law goes back to the Middle Ages, and it says don't marry a Catholic, that is not and should not be, respectfully, the public policy of the state of Illinois in 2009, and quite frankly, it was not the public policy of the state of Illinois in 1898 when Ransdell was decided. Counsel, do you find opposing counsel's argument that the provision at issue in this case does not attempt to control future behavior or marital decision-making to be a distinction without merit? Yes, that is a distinction without merit because Max's limitation on who is a descendant says once you marry outside the Jewish faith, you don't convert within a year, you're deemed deceased as of the date of the wedding. And so from 1983, 84, 85, you know, it was controlled. I think his position is that when the death occurs, you have to be married to a person of the Jewish faith on that date. There's nothing said what has to happen in the future. If you inherit at that time and then do whatever you want, I guess. Right. If you believe that somehow Earl's power of appointment creates some new condition precedent, under Max's trust, it's not just as of Max's death. As of Max's death, Michelle was unmarried. She had not married outside of the Jewish faith. She would take. But for the next 20 years while Earl lived, she has this cloud hanging over her. Quite frankly, had they known about the clause, Earl was quite advanced in age at that time. She died literally two years after the wedding. They could have said, well, Earl is looking sickly. Maybe we should postpone our wedding until she dies. We don't want to lose our inheritance. That is not what the public policy should be. But, you know, the timing was off. Had they married three years later, they would have taken. Had Michelle remained unmarried, and this is such a crucial fact when you realize that conditions need to be for the benefit of the donee, she would take. Your Honor, Justice, I asked a question specifically about does it use a, first of all, does it use a funded trust? And they said it doesn't, which is just not accurate. As they concede on page 15 of their reply brief, they say on page 15 of their reply brief that basically if there is a surplus in the Earl estate, that it goes into trust and that if any of the children marry outside of the faith, they're deemed deceased. In other words, it does go on for an indefinite period of time. So it does have that kind of long arm control, that kind of dead hand control over a fundamental right, the right to marry, which this court held in people, the court, the public policy of the state is to promote marriage, not to discourage marriage. And when it came up that Michelle had another option, there was another option I think was language used, was to convert. She also had a third option, to remain unmarried. Because the argument here is that if you marry outside of the faith, you're deemed to abandon the faith, but remaining unmarried would have been a way that Michelle could have taken under the will. If she had not married Ethan, she would be enjoying her legacy right now. So the fact is when you say to somebody, if you remain unmarried, that discourages marriage and violates the public policy of Illinois. Nobody really has a right to a legacy, do they? I mean, you can disinherit your grandchildren, your kids if you want to. Absolutely, without right bequests. I mean, you're disposing of your own property. Absolutely, without right bequests. Without right bequests. But when you try to impose a condition that goes on and on and on after your death, then the condition will not be enforced unless it's for the benefit of the donee. I'll give you my estate if you quit smoking. That's for the benefit of the donee. It's enforceable. On marriage, so long as you don't marry before the age of 21, it's for the benefit of the donee not to marry too young. It's a minor restraint. It's not any kind of permanent restraint. It doesn't implicate religious rights or civil rights. It's enforceable. So the concern here is not whether Max or Erla had the right to do with their money. If what they say about Erla's intent is true, then she should have simply written Michelle out of the will by using the power of appointment. And anybody that wants to disinherit or disown their children for religious reasons, racist reasons, or any other reasons is free to do so, so long as they use outright bequests. But once you get into that world of conditional bequests with dead-hand control, and if you look at the six decisions in Illinois, whether these clauses are upheld or not, they turn on whether or not there's that dead-hand control. The only two cases where this court upheld any kind of restraint on marriage, Gerbing and Hall, the court both specifically noted it's because at the time of death the rights were fixed. If the question was, Max is dead, let's see who's married outside of the faith, you freeze it in time, that's fine. And that's why in Hall versus Gerbing, conditions that said, my daughter will take so long as she is divorced at the time of my death were fine. Because you look at the time of the death, it's a snapshot, she's divorced, she takes. The testator didn't like the husband, didn't want the husband to squander the estate. Fine, because there's no dead-hand control. And in this case, it is a condition subsequent, and that's why they're so desperate to do these legal gymnastics to get around it. So there's not a part of your argument that would indicate that one way that she could have taken is if she divorced the person who was presumably not of the Jewish faith? That's our, the Justice Quinn in his concurring opinion said that this idea would be, whether there's resurrection would be a difficult question, one that courts are not suited. But the plain language says that you're deemed deceased as of the date of marriage. So I don't know if a divorce would resurrect you once you've been deemed deceased. And Justice Quinn said that would be a difficult question that the courts probably aren't well suited for. So, you know, I. It's not before us at any rate. Excuse me? It's not before us at any rate. Exactly. It's not before the court at this point. Let me ask you this question in part to follow up on an earlier question by Justice Garmon on this public policy issue. If it turns on whether or not a clause encourages or discourages marriage, does that operate in a legal stratosphere or does it operate in the lives of these people? Because if a recipient does not know about the clause, how would the clause impact that recipient's conduct to marry or not marry in the faith or outside the faith? Well, because the case law talks about the capacity to influence. It doesn't, from this court's determination, if the court, it doesn't matter if the recipient knew because the court can't enforce the clause. It's void against public policy. That's the problem with conditional bequests. With conditional bequests, you're dead. You're asking the court to, on an ongoing basis, you know, enforce your wishes. And when your wishes are religious in nature and when you want a court to point the finger of the law and state action at someone and say, you are not a Jew, right, which is what would have to happen for Michelle to be disinherited, that violates the First Amendment. But the clause did not take effect until Perla passed away in 2003. Is that right? No, that's incorrect, Your Honor. Well, I know it was created and took effect in 86, but there could be no distribution until she died, right? No, that's not correct because under her power of appointment, she could, she was given the power, not a general power of appointment, a specific power of appointment. She could give money to the people that met the definition of decedents, but if you marry outside the faith, you're already excluded from that by Max's condition subsequent. So the people that Erla can give to are limited. She could not, for instance, give the money to the State of Israel because the State of Israel is not one of the decedent, Max's decedent. So she was given a limited, not a general power of appointment. So does that answer your question? Well, in part. I guess this whole question about the power of appointment, I'm not sure if that's been fully briefed and whether or not we have the complete trust document in the record. Well, and that's, and I'm reading now, we do on page, the complete trust document is in the record. And I'm reading the appendix as well to Michael's brief. And I'm reading from page A58 of that appendix, the Jewish clause. It says, a descendant of mine other than a child who marries outside of the Jewish faith, unless converts and his or her descendants shall be deemed deceased for all purposes of this instrument. But one of the purposes of the instrument was Erla's power of appointment. Erla's power of appointment is authorized only by the instrument in the prior clause. And so when you talk about the purposes of the instrument, all purposes of the instrument, then that includes the power of appointment. You don't define descendants, you know, in one clause in the instrument and use it in a different term in another place in the instrument. So just like a codicil to a will is part of the instrument of the will overall, the fact that Erla's power of appointment was executed later, it's still part of this instrument. It has no legal effect independent of Max's trust. Counsel, going back to where you said if the clause is in the interest of the donee, you remember your example of as long as he quit smoking, that example? Correct. What about when we have something that the interest or good of the donee is subjective? I'm sure if you went back to Max, Max would say it is in the interest of the donee that my child continue in the Jewish faith. Absolutely. And I understand it's subjective. Obviously the child in this case didn't think or presumably, I know there's some fact questions, didn't think that that was the case. How does that enter into the discussion? That in this case it's uncontroverted that, and they say on their reply brief on page 10, and I'm quoting now, that Michelle assumes the beneficial motive must benefit her personally as opposed to the Jewish people generally, but cites no authority for this narcissistic public policy, right? The purpose was not to benefit Michelle. They acknowledge the purpose was to benefit the Jewish people generally, and that's not a, the policy of benefiting the donee is not narcissistic. It's what this court said in Ransdell is the requirement in order to enforce a condition with dead hand control. Even if they had said in there that the interest is to benefit Michelle because we think that the Jewish faith is the one true faith and the faith that she should be involved in, your argument would still be the same today. You wouldn't say that their interest would control or what they thought the good of Michelle would control, right? Correct. I mean, it's a subjective thing, isn't it? Whether or not, in Ransdell the court did say that the interest of the donee from the perspective of the testator, absolutely, but there's no evidence on that. There's no evidence on Max's intent. So if, okay, so I stand corrected then. You would not make that argument if the clause had just said we're putting in the Jewish clause or the faith clause, whatever you want to call it, we're putting it in for the benefit of Michelle. That would have been enough to validate that clause? No, because that would be against public policy and all the other reasons we cite in our brief. It would be unconstitutional. In these religious clauses, there's independent constitutional problems because, again, it's easy for Max to say I don't think you're Jewish anymore, I disown you. But once you get into a contested estate battle and a court has to say you didn't marry a Jew, Ethan's not a Jew, that becomes an unconstitutional determination, right? One of the cases that Judge Quinn cited in his concurrence was the court found that somebody wasn't a Catholic because they didn't take their first communion because they were in the hospital and they were very, very ill, even though they were baptized and even though they went to Catholic school and even though they attended Mass regularly, and the courts took testimony from priests to determine who was a Catholic. The days of ecclesiastical courts are gone. Courts cannot determine religious questions. In fact, they go so far, right, in calling it a religious preference clause and say that they should get a thumb on the scale because they're the minority religion and if this court doesn't go out of the way to preference the Jewish religion, it'll get usurped. But the U.S. Supreme Court in the Allegheny case has made it very, very clear that no religion gets preference. Majority, minority, doesn't matter. Courts cannot preference one religion over another. And when you ask a court to enforce your religious wishes after you are dead, you are implicating state action. And that's where Shelley Vicious-Kramer and these other cases come in with restrictive racial deeds, right? If two racists want to have an agreement not to sell their homes to African Americans, that's fine. But when they put it in a deed and say courts now enforce this in perpetuity, then the Supreme Court held that violates the 14th Amendment. Well, it's the same thing here. If Max wanted to say I disown you if you marry a Catholic, which was the whole thing in Ray Lieberman's case, he would have been free to do that so long as he does it with an outright distribution. But when he says I want the courts to do it from 1983 on until the rule of perpetuities expires, right, starting with three generations, 75 years, and then the courts are supposed to be enforcing religious preferences and making religious determinations like who is a Jew. What standard do you use? Born to a Jewish mother? Some Jewish religions are patrilineage. Some Jewish religions require you to be born of both. I regrettably tell you your time is up. Okay. Thank you very much. The most important thing I think I need to say is that this case is not the case of don't marry a Catholic or don't marry outside of my racial group. That question is not presented by this case. And there are a variety of public policy considerations that aren't at play in this case that would be at play in those other cases. This case is about whether a beneficial intent, an intent to foster religion within one's own family and to foster one's religion generally and to enforce one's own religious community, whether that clause is enforceable. And the suggestion that this would lead to some boogeyman case where we have to enforce terrible bigotry, I think that's a ridiculous suggestion. You heard counsel say again and again and again that dead hand control is the issue. But what you didn't hear counsel say, what you won't hear counsel acknowledge, is that there is no further control on future conduct as of the date of Erla's death. The question was raised, when does the will speak? It speaks on Erla's death. Prior to Erla's death, all of the beneficiaries were merely contingent. She could have directed all of the money to any one of her descendants for any reason whatsoever. The question of who is a descendant, too, you heard counsel say, well, she's limited. Could she have selected a descendant who was married to a non-Jewish person? It is my contention that she could have, yes. I don't think that she was limited by the terms of the religious preference clause. She was required to make that power or exercise that power in favor of one of Max's descendants. But Max's trust doesn't define descendants as descendants who are not deemed deceased. The religious preference clause only defines the term deemed deceased, not descendant. But again, what she could have done, it really doesn't matter if she was limited or not. Can I stop you for just a moment? Sure. So she wouldn't have looked at the will to decide whether or not it was an appropriate descendant? Well, it's hard to take a contrary position to that because she clearly did look at the will. She said deemed deceased, and that term is a term that's defined in the trust. What she intended was to exclude anyone who would have been deemed deceased under the will. So I can't really say that she didn't need to because, in fact, she did. I don't know what she – I suppose it would be my contention that she didn't need to because I don't believe she was limited by the religious preference clause in exercising her power, yes. But again, that's not crucial to a decision in this case. She could have exercised the power of appointment in favor of any descendant, and she chose to limit the class to descendants who were not deemed deceased. The question of benefit to the doneen also came up. I think that's an important point. It's not our contention or not our entire contention that the benefit must be to the Jewish people generally rather than to Michelle. It's certainly true that Max thought that the Jewish faith would benefit to his children and grandchildren. The question is where do you look to determine what standard controls a question of intent? In Ransdell, if we apply the case that appellees want to apply, if you look at the Ransdell case, it says the conditions and limitations they believe, the testator believes, is in the best interest of his donees. If you look at the Hall case, the Hall case says we'll enforce a condition that encourages divorce because of the reasonable beliefs of the testator that it was for the benefit of the donee. So it's a mistake to say that we ought to have some objective standard of benefit. All the case law that talks about benefit, to the extent you apply that case law, talks about a reasonable belief of a benefit. I think it's also a mistake to say that Ransdell stated a public policy that the third restatement was merely codifying. If that were true, Ransdell, which was decided in 1898, would have appeared in the second restatement, and it didn't. The second restatement is from 1959, and it didn't appear there. In fact, it appeared there as a case enforcing a clause encouraging divorce. It doesn't say anything at all about provisions calculated to prevent or to discourage a marriage. The suggestion that this court would have to determine who is a Jew, is also, I think, a straw man argument. That's a question of fact and intent. If there is an ambiguity, and I don't in fact believe there really is, the traditional understanding of who is a Jew is someone whose mother was a Jew or who has gone through a formal conversion process. But if there were a real ambiguity presented as to some hypothetical third party, because let's not forget, Ethan Trull has never claimed to be Jewish in any way, of any branch, of any stripe. But if this were to be applied to some hypothetical third party, we would take evidence of the testator's intent, just like we would with any other ambiguous provision. We would determine what the testator believed constituted a member of the Jewish faith. We're not initiating ecclesiastical courts. The constitutional question really isn't presented by this case because this court doesn't need to find a constitutional violation in order to find that there's no clear public policy that supported voiding the clause. However, the real difference between this case and the cases raised by Apolli are that Shelley v. Kramer, which was limited by the Supreme Court to its facts, really doesn't apply here. That involved what amounted to a discriminatory state action. There was a buyer and a seller, both willing, but a court was enforcing a previous restriction in the deed. Here, the court only needed to neutrally apply common law principles to give effect to the testator's intent, whatever that intent happened to be. The mere fact that a neutral application of common law might provide some incidental benefit to one religion or another, or a member of one religion or another, does not amount to a violation of the Establishment Clause, as Apolli suggests. The suggestion that there was a cloud hanging over Michelle at the same time she didn't know about the clause is a bit disingenuous. There's no record that Michelle didn't have knowledge of the clause. What there is a record of is that Max was very clear about his intentions. I think Michelle's mother and father both provided affidavits to that effect, that Max was very clear what he intended to do and the reasons he intended to do it. I believe that's all I have, unless the Court has any other questions. Thank you very much for your time. Both counsel, thank you very much. Case number 106982 will be taken under advisory.